**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL AIR TRAFFIC <br> CONTROLLERS ASSOCIATION <br> ("NATCA"), *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, *et al.*, <br><br> Defendants. | Civil Action No. _____ |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFFS' MOTION FOR A TEMPORARY
<u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

**I.   INTRODUCTION**

Plaintiffs National Air Traffic Controllers Association ("NATCA"), on behalf of its members, and Individual Plaintiffs, Amanda Fuchs, Kevin Bianchi, Jonathan Barnett, and John Garner pursue this action on behalf of themselves and all others similarly situated against Donald J. Trump, the United States, Daniel K. Elwell, the Federal Aviation Administration, Margaret Weichert, the Office of Personnel Management, Mick Mulvaney, the Office of Management and Budget, David Bernhardt, and the Department of the Interior (collectively, "Defendants") for violations of the Due Process Clause of the Fifth Amendment to the United States Constitution and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* In the instant motion, plaintiffs respectfully request that this Court enter a temporary restraining order and a preliminary injunction against defendants as to plaintiffs' claims under the Fifth Amendment.

Pursuant to LCvR 65.1(d) and based on the facts outlined below, plaintiffs request that this motion be heard on an expedited basis.

## II.     BACKGROUND

NATCA's members, as well as individual plaintiffs Amanda Fuchs, Kevin Bianchi, Jonathan Barnett, and John Garner, are air traffic controllers employed by the U.S. Federal Aviation Administration ("FAA"). Complaint ("Compl."), ¶¶ 6-7. Every hour of every day, the plaintiffs and all other air traffic controllers oversee the skies and are responsible for ensuring the expeditious flow of traffic, in the air and on the ground, at our nation's airports. Compl., ¶ 1. Plaintiffs work long hours and lengthy overtime shifts to ensure the safe routing of tens of thousands of flights daily. *Id.* The plaintiffs' job duties include monitoring and directing the movement of aircraft on the ground and in the air; controlling ground traffic in airport runways and taxiways; issuing landing and takeoff instructions to pilots; transferring control of departing flights and accepting control of arriving flights; informing pilots of critical information including weather and runway closures; and alerting airport response staff in the event of an aircraft emergency. *See* Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook,* "What Air Traffic Controllers Do," *available at* https://www.bls.gov/ooh/transportation-and-material-moving/air-traffic-controllers.htm#tab-2 (last accessed Jan. 7, 2019). *See also* Compl., ¶ 18; Declaration of Amanda Fuchs ("Fuchs Decl.")[1], ¶ 5; Declaration of Kevin Bianchi ("Bianchi Decl."), ¶ 5; Declaration of Jonathan Barnett ("Barnett Decl."), ¶ 5; Declaration of John Garner ("Garner Decl."), ¶ 4. Plaintiffs' job requires a Secret Security Clearance. Fuchs Decl., ¶ 4; Bianchi Decl., ¶ 4; Barnett Decl., ¶ 4. Indeed, Plaintiffs' job is so demanding and requires such rare skills that the FAA struggles to maintain a full complement of certified Air Traffic Controllers, even under normal circumstances. Declaration of Eugene

---

[1]     Supporting Declarations are appended to this brief.

Freedman ("Freedman Decl."), ¶ 13 ("The number of fully certified Air Traffic Controllers across the FAA is at a 30-year low.").

The plaintiffs are paid on a bi-weekly basis, through direct deposit, on the payroll schedule set by the Department of the Interior. Freedman Decl., ¶ 8; Fuchs Decl., ¶ 6; Bianchi Decl., ¶ 6; Barnett Decl., ¶ 6; Garner Decl., ¶ 5.  The individual plaintiffs maintain bank accounts at SkyOne Federal Credit Union, Aspire Federal Credit Union, or Cinfed Credit Union. On each designated pay day, the government submits the plaintiffs' payroll funds to these banks, and the banks directly deposit the paychecks into the plaintiffs' accounts. Fuchs Decl., ¶ 6; Bianchi Decl., ¶ 6; Barnett Decl., ¶ 6; Garner Decl., ¶ 5. The banks typically receive an electronic payroll file through ACH, an electronic network used by financial institutions to clear electronic transfers of funds, from the government on Thursday evenings by 8:30 p.m. eastern prior to the scheduled pay day. *E.g.,* Declaration of Mike Perez ("Perez Decl."), ¶ 4. On Friday morning, once the banks open for business, the banks extend credit to any FAA employees in the amounts indicated in the electronic payroll file.[2] *E.g.,* Perez Decl., ¶ 5.

The last date on which the banks received electronic payroll files for a full pay period from the FAA's payroll processor was December 27, 2018. Perez Decl., ¶ 6. The last date on which government payroll funds for a full pay period were deposited into the plaintiffs' bank accounts was December 28, 2018. *Id.*

On December 20, 2018, President Donald J. Trump announced he would refuse to sign a bill necessary to fund the federal government beyond December 22, 2018. Compl., ¶ 22. As a result, budget appropriations for much of the government lapsed on December 22, 2018, and a

---

[2]   The banks extend credit because they do not receive cash funds from the government until the Tuesday following the receipt of the electronic payroll file. *E.g.,* Perez Decl., ¶ 5.

partial government shutdown began. Compl., ¶ 23. December 22, 2018 was also the last day of a pay period. Freedman Decl., ¶ 8.

The FAA exhausted its appropriated funds on December 24, 2018. Freedman Decl., ¶ 6. This means that there were two additional operational days during which the FAA was not shutdown: December 22, 2018, and December 23, 2018. Even though the FAA had funding for December 23, 2018, the first day of the first pay period of 2019, it did not pay the individual plaintiffs or NATCA's members who worked on December 23, 2018. Freedman Decl., ¶¶ 9, 11; Fuchs Decl., ¶ 9-10; Bianchi Decl., ¶¶ 9-10; Barnett Decl., ¶¶ 9-10; Garner Decl., ¶¶ 8-9.

As a result of the government shutdown, non-excepted personnel, including employees in the positions of Staff Support Specialists who work at air traffic control facilities were furloughed. Freedman Decl., ¶ 14. These furloughed workers normally support the Air Traffic Controllers by providing tactical, strategic, and administrative support for training, quality assurance, and traffic management. Furloughed support personnel also oversee and revise airspace procedures, operational automation, support for military operations and safety management systems, and safety reporting. Freedman Decl., ¶¶ 13-14. Other furloughed aviation safety professionals include aircraft certification engineers, who assist in design, production approvals, and airworthiness certification of aircraft and their components, engineers who design and construct critical infrastructure necessary for safe flight operations, including air traffic control towers, radar maintenance and installation, navigational aids, and communications systems. Flight test pilots were also furloughed. Freedman Decl., ¶ 14.

However, the individual plaintiffs and some 16,000 NATCA bargaining unit members who occupy air traffic controller and related positions were designated as "excepted" employees and directed by the defendants to continue working their regular schedules and overtime hours, despite

the lack of funding. Freedman Decl., ¶¶ 7, 10, 12. Plaintiffs have continued to work both regularly scheduled hours and/or overtime hours as Air Traffic Controllers, without compensation, since December 23, 2018. Freedman Decl., ¶ 10; Fuchs Decl., ¶ 9-10; Bianchi Decl., ¶¶ 9-10; Barnett Decl., ¶¶ 9-10; Garner Decl., ¶¶ 8-9. Plaintiffs will continue to work as directed and without compensation until the government shutdown is resolved.

On January 11, 2019, plaintiffs expected, based on the Department of Interior payroll schedule, to receive a paycheck for the first pay period of 2019, which began on December 23, 2018. Freedman Decl., ¶ 9; Fuchs Decl., ¶ 7; Bianchi Decl., ¶ 7; Barnett Decl., ¶ 7; Garner Decl., ¶ 6. However, the FAA did not provide any payroll files to the banks on January 10, 2019, for the work performed on or after December 23, 2018, nor were any paychecks deposited into the plaintiffs' bank accounts on January 11, 2019, for work performed on or after December 23, 2018. Perez Decl., ¶ 7; Fuchs Decl., ¶ 12; Bianchi Decl., ¶¶ 12; Barnett Decl., ¶¶ 12; Garner Decl., ¶¶ 11.

Plaintiffs' Leave and Earnings Statements for the first pay period of 2019 show that they earned zero dollars for work performed that pay period. Fuchs Decl., ¶ 13; Bianchi Decl., ¶ 13; Barnett Decl., ¶¶ 13; Garner Decl., ¶¶ 12.

This is true even for the plaintiffs who worked on December 23, 2018, a date for which the FAA still had operational funds for payroll. Freedman Decl., ¶¶ 6, 11. Plaintiffs have suffered an injury and have been deprived of all of the compensation to which they are entitled, for work already performed, for the time period since December 23, 2018. Fuchs Decl., ¶ 14; Bianchi Decl., ¶ 14; Barnett Decl., ¶ 14; Garner Decl., ¶ 13. The defendants did not provide the individual plaintiffs or NATCA's members with any opportunity to be heard regarding the Government's decision to deprive them of their property (i.e., payment for their work performed during the first

pay period of 2019) prior to depriving them of their property. Fuchs Decl., ¶ 15; Bianchi Decl., ¶¶ 15; Barnett Decl., ¶¶ 15; Garner Decl., ¶¶ 14. In addition, they did not receive any overtime pay for overtime worked in the pay period that ended on December 22, 2018 in the paycheck for that pay period. Freedman Decl., ¶ 8.

### III.  ARGUMENT

#### A.  Legal Standard for Emergency Relief

In the District of Columbia Circuit, the same standards apply to temporary restraining orders and preliminary injunctions. *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977); *Dunlap v. Presidential Advisory Com'n on Election Integrity,* 319 F. Supp. 3d 70, 81 (D.D.C. 2018). To obtain emergency relief in the form of a temporary restraining order and/or a preliminary injunction, a plaintiff must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius,* 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Natural Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *City Fed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995) (noting that, for example, an "injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury").

#### B.  Plaintiffs Are Likely to Succeed in Demonstrating that the Government Violated the Fifth Amendment's Due Process Clause

The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S.

CONST. amend. V. "To maintain a procedural due process claim, the plaintiff first must establish that the government deprived him of a constitutionally protected property interest, and then must establish that the government's procedures in doing so do not satisfy procedural due process." *Simms v. District of Columbia,* 872 F. Supp. 2d 90, 95 (D.D.C. 2012) (citing *Gen. Elec. Co. v. Jackson,* 610 F.3d 110, 117 (D.C. Cir. 2010). *See also NB ex rel. Peacock v. District of Columbia,* 794 F.3d 31, 41 (D.C. Cir. 2015) (to bring a claim under the due process clause, "a plaintiff must show (i) deprivation of a protected liberty or property interest, (ii) by the government; (iii) without the process that is 'due' under the Fifth Amendment.").

It is abundantly clear that the plaintiffs have been deprived of a constitutionally protected property interest—the salary earned for work already performed. That salary became due and owing today, January 11, 2019, yet it was not paid. Freedman Decl., ¶ 9; Fuchs Decl., ¶ 13; Bianchi Decl., ¶ 13; Barnett Decl., ¶¶ 13; Garner Decl., ¶¶ 12.

This Court has specifically held that a federal government employee's "right to a salary for work performed at the rate admittedly effective during the period when the work was performed is a right or property interest, a legitimate entitlement which qualifies for protection against governmental interference under the *Due Process Clause of the Fifth Amendment*." *Foley v. Carter,* 526 F. Supp. 977, 985 (D.D.C. 1981) (emphasis in original). Indeed, the *Foley* court recognized that, in *United States v. Larionoff*, the Supreme Court "viewed with displeasure" congressional attempts to deprive employees "of pay for services already performed yet owing." *Id.* (citing *United States v. Larionoff*, 431 U.S. 864, 879 (1977)); *see also Larionoff,* 431 U.S. at 879 (noting that actions taken by congress with the intent to "deprive a service member of pay due for services already performed, but still owing" would present "serious constitutional questions"). Here, the plaintiffs have much more than a mere expectation of payment for their services; instead,

because they have already performed work for the defendants, the plaintiffs have an *entitlement* to compensation for that work. This entitlement is protected by the due process clause of the Fifth Amendment.

There is also no question that this deprivation "occurred at the hands of the government." *NP ex rel. Peacock,* 794 F.3d at 42. It is the government that is responsible for compensating its employees. The Office of Management and Budget has oversight over the Government's funding, so it should have ensured payment to its workers for work performed. *See* Compl., ¶ 15. The FAA's website states that "[d]ue to a lapse in funding, the FAA will only conduct 'exempt' activities," but also states that "Air traffic control is fully operational." Federal Aviation Administration, "FAA Operations Update," *available at* https://www.faa.gov/news/updates/?newsId=92587 (Dec. 22, 2018 9:36 PM EST). As a result, the plaintiffs have had to work during the shutdown without pay. Freedman Decl., ¶ 7; Fuchs Decl., ¶ 9-10; Bianchi Decl., ¶¶ 9-10; Barnett Decl., ¶¶ 9-10; Garner Decl., ¶¶ 8-9.

Finally, the government has not provided the process due because it has not provided *any process whatsoever* for the plaintiffs to be heard prior to being deprived of their protected property. Fuchs Decl., ¶ 15; Bianchi Decl., ¶ 15; Barnett Decl., ¶ 15; Garner Decl., ¶ 14. "Once it is determined that due process applies, the question remains what process is due." *Federal Deposit Ins. Corp. v. Mallen,* 486 U.S. 230, 240 (1988). "[T]he due process clause requires, at minimum, that the government provide notice and some kind of hearing before final deprivation of a property interest." *Propert v. District of Columbia,* 948 F.2d 1327, 1331 (D.C. Cir. 1991). "The notice provided must be 'reasonably certain to inform those affected' . . . and the opportunity to be heard must be given 'at a meaningful time and in a meaningful manner.'" *Id.* at 1332 (quoting *Mullane*

8

*v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 215 (1950) and *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965)).

Beyond this baseline, "the contours of due process are flexible and vary depending on the circumstances of a given case." *Id.* Nevertheless, as this Court has explained, "however weighty the governmental interest may be in a given case, the amount of process required can never be reduced to zero - that is, the government is never relieved of its duty to provide some notice and some opportunity to be heard prior to final deprivation of a property interest." *Id.* at 1332.[3]

Here, the defendants have not provided any public hearing, nor were there any opportunities for the plaintiffs to be heard in a meaningful manner prior to the deprivation of their property. *See Propert,* 948 F.2d at 1332. The deprivation occurred today, January 11, 2019, when the defendants failed to pay plaintiffs a single penny for the work they performed during the first pay period of 2019; the defendants did not even bother to pay the plaintiffs for work performed on December 23, 2018, a date on which the FAA was still funded for operations.

In addition, there is no guarantee that the plaintiffs will *ever* be paid for the work they have already performed and for which they are entitled to compensation. *See* U.S. CONST. art. I, § 9, cl. 7 ("No money shall be drawn from the Treasury but in consequence of appropriations made by law."); 31 U.S.C. § 1341(a)(1) ("An officer or employee the United States government or of the

---

[3] The Supreme Court has held that it will "tolerate some exceptions to the general rule requiring predeprivation notice and hearing, but **only in 'extraordinary situations**' where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *U.S. v. James Daniel Good Real Prop.,* 510 U.S. 41 (1993) (quoting *Fuentes v. Shevin,* 407 U.S. 67, 82 (1972)) (emphasis added). However, the instant situation is not "extraordinary." In fact, the current government shutdown was entirely foreseeable. In this day and age, government shutdowns are not uncommon. Indeed, this was the ***third*** shutdown in 2018. *See, e.g.,* Manu Raju and Sophie Tatum, "Government partially shuts down for third time in a year after Congress adjourns for the night," *CNN* (Dec. 22, 2018 12:27 AM ET), *available at* https://www.cnn.com/2018/12/21/politics/cornyn-no-vote-government-shutdown/index.html.

District of Columbia government may not involve either government in a contract or obligation for payment of money before an appropriation is made unless authorized by law."). In fact, the Office of Personnel Management has provided guidance to excepted employees that they can be compensated for work performed during a lapse in appropriations *if* Congress passes *and* the President signs a new appropriation or continuing resolution. U.S. Office of Personnel Management, "Guidance for Shutdown Furloughs" (Sept. 2015) at 6, *available at* https://www.opm.gov/policy-data-oversight/pay-leave/furlough-guidance/guidance-for-shutdown-furloughs.pdf. The uncertainty of both of these events looms large in the present political environment.

The complete lack of process provided by the defendants prior to taking the plaintiffs' property is entirely inadequate and cannot satisfy the Fifth Amendment. Accordingly, plaintiffs will easily establish a violation of the Fifth Amendment's Due Process Clause and are likely to succeed on the merits of this claim.

### C. Plaintiffs Will Be Irreparably Injured Absent Injunctive Relief

To demonstrate irreparable harm, an injury "must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). A plaintiff must demonstrate that "[t]he injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (quoting *Ashland Oil, Inc. v. FTC,* 409 F. Supp. 297, 307 (D.D.C.), *aff'd,* 548 F.2d 977 (D.C. Cir. 1976).

Significantly, "[i]t has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. Dist. of Columbia,* 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). *See also Simms v. District of Columbia,* 872 F. Supp. 2d 90, 104 (D.D.C. 2012) (citing

*Wisc. Gas Co.* and *Mills*); 11A Wright & Miller, Fed. Prac. & Proc. § 2948.1 (2d ed. 2004) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.")

Importantly, this Court has repeatedly held that a violation of a plaintiff's Fifth Amendment due process rights constitutes irreparable injury. *Simms,* 872 F. Supp. 2d at 104-05; *Gordon v. Holder,* 826 F. Supp. 2d 279, 296 (D.D.C. 2011) (violation of plaintiff's procedural due process rights creates irreparable harm); *Goings v. Court Servs. & Offender Supervision Agency,* 786 F. Supp. 2d 48, 78-79 (D.D.C. 2011) (same).

In addition, the plaintiffs have suffered greatly as a result of the government's actions. The uncertainty related to when they will receive their next paycheck, combined with the everyday normal stress of one of the country's most stressful jobs, has caused substantial hardships and will continue to do so absent relief. Freedman Decl, ¶ 15. For example, Plaintiff Amanda Fuchs, a single mother, is financially responsible for her seventeen-year-old child, as well as her adult brother, who suffers from memory and mobility issues, and requires assistance. Fuchs Decl., ¶ 16. She is responsible for her brother's medical care that is not covered by insurance. Fuchs Decl., ¶ 16. Plaintiff Fuchs also provides financial assistance to her eighteen-year-old child, who assists Fuchs's mother and stepfather, both of whom suffer from health problems. Fuchs Decl., ¶ 17. Additionally, Plaintiff Fuchs requires weekly physical therapy for a pelvic condition in advance of surgery to take place in the coming months. Fuchs Decl., ¶ 18. As a result of working without pay, she may not be able to afford the necessary physical therapy, which will prevent her from having the much-needed surgery; and she may not be able to cover her brother's medical bills. *Id.* To compound the misery caused by the government's taking of her property without due process, Plaintiff Fuchs's grandmother passed away on January 8, 2019. Fuchs Decl., ¶ 19. Without pay,

Plaintiff Fuchs is unable to afford travel to attend her grandmother's funeral. *Id.* That she will not be able to honor her grandmother's life at the funeral, that she will be unable to mourn side by side with family members, has caused Fuchs tremendous sorrow. *Id.*

Additionally, Plaintiff Fuchs has two Thrift Savings Plan loans, and she repays the loans through payroll deductions. While she is not being paid, she is unable to make the payments on these loans and, depending on matters that are out of her hands (i.e., whether the President and Congress will appropriate funding for the FAA and whether they will ultimately provide payment for this work through legislation), she may be penalized as a result. Fuchs Decl., ¶ 20.

Similarly, Plaintiff Jonathan Barnett is also a parent and has three young children. Barnett Decl., ¶ 16. He is the sole financial provider for his family, as his wife is unable to work because she cares for their four-year-old child who has a sensory development disorder and autism. *Id.* His child requires several therapies per week, in addition to other medical care. Barnett Decl., ¶ 17. Plaintiff Barnett's insurance does not cover all of his child's medical expenses, so he is financially responsible for several medical bills each week. *Id.* The defendants' actions have made Plaintiff Barnett's ability to ensure that his child has appropriate and necessary medical care uncertain. Further, Plaintiff Barnett currently lives in a rental property with his family, but his landlord wishes to reoccupy the rental home. Barnett Decl., ¶ 18. Plaintiff Barnett fears that even one late rental payment will result in eviction. *Id.*

Plaintiff Kevin Bianchi is subject to a court order garnishing his wages for mandatory alimony payments. Bianchi Decl., ¶ 16. Without a paycheck, these mandatory payments will not be made. If Plaintiff Bianchi's ex-wife requests relief from a court and claims that plaintiff Bianchi violated a court order, it will likely result in the loss of his secret security clearance. Bianchi Decl.,

¶ 17. The secret security clearance is a requirement of his Air Traffic Controller position. Fuchs Decl., ¶ 4; Bianchi Decl., ¶ 4; Barnett Decl., ¶ 4.

Plaintiff John Garner's wife just underwent serious surgery. Garner Decl., ¶ 15. Although Garner has medical insurance, there are substantial uncovered costs associated with the surgery that he may not be able to pay. *Id.* This includes 25% of the costs for the procedure, which are out of pocket. *Id.* The government's taking of his property at this time in his life has left him anxious about his ability to pay for his wife's surgery. *Id.*

Measuring the weight of these individual losses as they are multiplied across the thousands of Air Traffic Controllers represented by NATCA becomes unbearable; a continued deprivation of rights is not sustainable for NATCA's members, who already serve the nation in one of the most stressful jobs in the country. These are losses for which future monetary compensation is insufficient. The kind of losses suffered by the plaintiffs—the inability to provide medical care to immediate family members, the inability to pay for one's own medical care, possible eviction, missing loved ones' funeral, **loss of peace of mind**—can never be reversed. Monetary relief will never make them whole. Plaintiffs' harm is therefore irreparable and can only be remedied through the issuance of a temporary restraining order or preliminary injunction. *See Chaplaincy of Full Gospel Churches v. England,* 454 F.2d 290, 297-98 (D.C. Cir. 2006) ("the injury must be beyond remediation" to constitute irreparable harm).

America wants its Air Traffic Controllers to be laser-focused on landing planes safely and monitoring America's runways, not distracted by financial issues and anxiety of financial instability, caused by the Government's unlawful taking of their property without due process.

### D. The Balance of the Equities and the Public's Interest Strongly Favor the Relief Requested

The balance of the equities in this case, as well as the public interest, strongly favor the entry of a temporary restraining order and a preliminary injunction against the defendants. The harm to the defendants resulting from temporary restraints and an injunction would be minimal, as their harm would be limited to restoring the plaintiffs' pay for hours worked since the shutdown, and to providing the plaintiffs with a meaningful opportunity to be heard on any future deprivation of property. Beyond that, the government would not suffer *any* harm because there are funds available to pay the plaintiffs in the United States Department of Treasury Judgment Fund. *See* 31 U.S.C. § 1304. Moreover, *the FAA had funds available through December 23, 2018,* to pay this workforce for work performed on that date, but nevertheless failed to pay NATCA's members for such work. Freedman Decl., ¶ 11; Garner Decl., ¶ 12; Fuchs Decl., ¶ 13.

Indeed, in balancing the equities, the government actually has an interest in having the Court grant the requested relief because it will help maintain stability in the FAA's continued provision of services essential to the safety of the country, as well as in the "effective functioning" of the air traffic controller workforce, which would be *furthered* by providing due process prior to depriving that workforce of their property. *See cf. AFGE v. Loy*, 332 F. Supp. 2d 218, 231 (D.D.C. 2004) (noting that "the effective functioning of the workforce of federal airport security screeners is undeniably a matter of significant government interest"). The government's continued deprivation of the plaintiffs' property without due process will disrupt essential government services and may, at some point, negatively affect the safety of the skies.[4]

---

[4] The Government's failure to pay other essential airport workers for work already performed has created a potential "massive security risk for American travelers." *See* Stephanie Beasley, "TSA union: Some screeners have quit as shutdown stretches on," *Politico.com* (Dec. 8, 2019, 2:01 PM EST), *available at* https://www.politico.com/story/2019/01/08/tsa-screeners-quit-

Of course, the harm to the plaintiffs that would result in denying the requested relief, as well as the harm to the public in the event that injunctive relief is not granted, are significant. Importantly, the injury to the plaintiffs—the deprivation of due process rights as provided for in the Fifth Amendment—is a constitutional one. As explained *supra,* a deprivation of an individual's Fifth Amendment Due Process rights necessarily causes irreparable harm. It is also without question within the public interest to prevent the government from violating constitutional rights. *See Gordon v. Holder,* 721 F.3d 638, 653 (D.C. Cir. 2013) (affirming lower court's grant of injunctive relief and noting that "the district court concluded that 'a potential deprivation of [Gordon's] constitutional right to due process . . . outweighs the possible injury to defendants from enjoining enforcement until the merits of Gordon's claim can be determined.'") (internal citations omitted); *Garza v. Hargan,* 304 F. Supp. 3d 145, 165 (D.D.C. 2018) (granting preliminary injunction, noting that "the public interest weighs in favor of a preliminary injunction because: (1) this case involves the protection of constitutional rights, and (2) 'the public has an interest in the government maintaining procedures that comply with constitutional requirements'") (quoting *Ass'n of Cmty. Organizations for Reform Now (ACORN) v. Fed. Emergency Mgmt. Agency (FEMA),* 463 F. Supp. 2d 26, 36 (D.D.C. 2006)); *Joudi v. Bush,* 2005 U.S. Dist. LEXIS 6265, *20-21 (D.D.C. Apr. 4, 2005) ("[T]he public interest undeniably is served by ensuring that Petitioners' constitutional rights can be adjudicated in an appropriate manner."); *see also, e.g., Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks omitted)), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); *G & V Lounge, Inc.*

---

government-shutdown-1087269 ("a wave of resignations could create 'a massive security risk for American travelers' since TSA cannot hire new screeners during a shutdown," quoting the President of AFGE's TSA Council).

*v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to protect the violation of a party's constitutional rights.").

Further, it is in the public interest to enter injunctive relief because of the safety issues that may result from a continued deprivation of the plaintiffs' constitutional rights. Air Traffic Controllers have immense responsibilities to ensure the safety of air travel. Freedman Decl., ¶ 2; Fuchs Decl., ¶ 5; Bianchi Decl., ¶ 5; Barnett Decl., ¶ 5; Garner Decl., ¶ 4. The plaintiffs work long hours, under stressful conditions and in pressurized situations. Freedman Decl., ¶ 15. *See also* Compl., ¶ 1. Even prior to the government shutdown, the number of fully certified Air Traffic Controllers across the FAA was at a 30-year low. Freedman Decl., ¶ 13. Because of the shutdown furloughs, the lack of support staff has made the jobs of the excepted Air Traffic Controllers even more stressful. Freedman Decl. ¶ 15; Fuchs Decl., ¶ 11; Bianchi Decl., ¶ 11; Barnett Decl., ¶ 11; Garner Decl., ¶ 10.

Indeed, Trish Gilbert, Vice President of the National Air Traffic Controllers Association, recently explained to NPR that it is essential for safety that the air traffic controllers be "focused 100 percent of the time," but that the lack of a paycheck and the lack of support structure will ultimately, the longer the shutdown continues, "cause harm to the system." *See* "Air Traffic Controllers Association Calls Shutdown 'Unacceptable,'" National Public Radio (Jan. 7, 2019 7:20 AM), *available at* https://www.npr.org/2019/01/07/682845294/air-traffic-controllers-association-calls-shutdown-unacceptable.

The entry of a temporary restraining order and preliminary injunction, restoring to plaintiffs the property taken without due process (i.e., the wages earned for the work already performed), will eliminate an additional, and crucial, stressor from the plaintiffs' lives. Thus, the balance of the equities and the public interest weigh heavily in the plaintiffs' favor.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that this Court issue a temporary restraining order against defendants and preliminarily enjoin them from violating the Fifth Amendment Due Process rights of the individual plaintiffs and NATCA's members.

Dated: January 11, 2019                                       Respectfully submitted,

                                                                                /s/ *Molly A. Elkin*
                                                Gregory K. McGillivary
                                                Molly A. Elkin
                                                Sarah M. Block
                                                John W. Stewart
                                                WOODLEY & McGILLIVARY LLP
                                                1101 Vermont Ave., N.W.
                                                Suite 1000
                                                Washington, DC 20005
                                                Phone: (202) 833-8855
                                                gkm@wmlaborlaw.com
                                                mae@wmlaborlaw.com
                                                smb@wmlaborlaw.com
                                                jws@wmlaborlaw.com